NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0463n.06

No. 14-2160

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 22, 2015
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JOY TABERNACLE—THE NEW TESTAMENT CHURCH, | ) ) ) |  |
| Plaintiff-Appellant, | ) ) |  |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) | OPINION |
| Defendant-Appellee. | ) ) |  |

BEFORE:    SILER, COOK, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  This appeal concerns two related disputes over the interpretation of an insurance policy under Michigan law.  The first issue is whether "decay," an enumerated cause of loss triggering coverage in the event of a building collapse, should be interpreted narrowly to denote only organic rot, as the district court held, or should be defined more broadly.  The second issue is whether the general exclusions for cracking and defective design apply to the collapse extension; the district court determined that both exclusions applied and precluded coverage.  Because the general exclusions are inapplicable in light of the specific terms of the collapse extension, and there are genuine issues of material fact as to whether decay occurred, we REVERSE the grant of summary judgment to State Farm and REMAND the case to the district court for further proceedings consistent with this opinion.

## I.    BACKGROUND

The ceiling of a church constructed in 1927 partially collapsed 85 years later in 2012. Plaintiff Joy Tabernacle—The New Testament Church ("Joy Tabernacle") purchased the property, located in Flint, Michigan, in 2009. At that time Defendant State Farm Fire and Casualty Company ("State Farm") issued Joy Tabernacle a policy covering the premises, and that policy was in effect at the time of the ceiling collapse.

The policy Joy Tabernacle purchased covers "accidental direct physical loss" to the premises, including the "buildings" and "business personal property" located at 2505 N. Chevrolet Avenue. R. 22-2, PageID 172; PageID 198. It contains general exclusions for several types of loss, including: "(1) Wear and tear"; "(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself"; and "(4) Settling, cracking, shrinking or expansion." *Id.* at PageID 202. The policy also generally excludes losses caused by "faulty, inadequate or defective" "[d]esign, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction" or "materials used in repair, construction, renovation or remodeling." *Id.* at PageID 203.

Although losses caused by "collapse" are generally excluded, Joy Tabernacle's policy includes a coverage extension for "collapse," which is described as "subject to the terms and conditions applicable to SECTION I of the coverage form." *Id.* at PageID 203, 204. The collapse coverage also provides in pertinent part:

> b. We will pay for accidental direct physical loss to Covered Property, caused by collapse of a building or any part of a building that is insured under this coverage form or that contains Covered Property insured under this coverage form, if the collapse is caused by any one or more of the following:
> (1) Any of the 'specified causes of loss' . . .[1]

---

[1] "Specified causes of loss" are defined as including the "weight of snow, ice or sleet; water damage." R. 22-2, PageID 217.

> (2) Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
>
> . . . .
>
> (6) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in Paragraphs (1) through (5), we will pay for the loss even if use of defective material or methods in construction, remodeling or renovation, contributes to the collapse.

*Id.* at PageID 204.

Robert McCathern, pastor of the Joy Tabernacle congregation, discovered the collapse of the sanctuary ceiling soon after it occurred on Saturday, December 15, 2012, and immediately called his State Farm agent. On Monday, Mary Brown, a State Farm claim representative, inspected the church. She confirmed that the plaster ceiling had collapsed, presumed that there was coverage under Plaintiff's policy, and issued initial payments to cover the costs of cleaning and replacing Plaintiff's property.

Brown, however, later questioned whether the collapse was covered. Joy Tabernacle hired Josiah Curry of Urban Builders and Developers, a contractor, and Michael Wise of Lopez Engineering, an engineering firm, to assess the structural integrity of the church. After an inspection performed in January 8, 2103, Wise reported that the "original design of the roof structure with the barrel roof has inherent problems," resulting not only in the collapse of the plaster ceiling affixed to the bottom of the trusses but also the bowing outward of the church's outside, load bearing walls by several inches. R. 23-2, PageID 519-20. From the attic above the ceiling, an area not visible to persons below, Wise observed that the "roof framing system" exerts too much horizontal pressure on the walls, weakening the walls' carrying capacity. *Id.* at PageID 519. The roof structure itself, he noted, had been reinforced with 2x10 ties and a central

"king splice post," which had been bolted to the original frame.[2] *Id.* These repairs, however, still allowed for movement within the roof that put additional pressure on the walls, and the tensions between the roof and wall movements were exacerbated by "seasonal changes in humidity," all of which contributed to the plaster loosening from the roof system. *Id.* at PageID 519-20. He recommended completely rebuilding the upper portion of the walls as well as the entire roof structure. *Id.* at PageID 520.

Brown commissioned another inspection of the church for State Farm. Daniel J. Miller, an engineer with I-ENG-A of Saginaw, examined the building on January 14, 2013 and described a series of problems similar to those observed by Wise, almost all "related to the performance of the site built scissor trusses." R. 22-3, PageID 253. Miller described the trusses as consisting of top chords constructed of 2x10 boards that were spliced—overlapped and nailed together—for 5 feet. *Id.* at PageID 252, 264 (see Fig. 7). Below these were the bottom chords of the truss, which had been reinforced with 2x6 boards spliced and bolted horizontally across the truss as well as vertical boards joining the horizontal boards to the center of the truss above, where the bottom chords crossed. *Id.* at PageID 252. This work had likely been done in the last 10-15 years. *Id.* Miller found the top chords to be "sagging," "kinked," and characterized by "extensive cracking and splitting." *Id.* The roof overall was "sagging," mortar joints on the south side of the building were "cracked open," and near the east side there were similar problems with the masonry. *Id.* at PageID 252-53. Miller also observed that: the "east and west exterior walls are pushed out at the top and the walls are bowed at the top along the length of the wall"; "many of the splices have failed" in the trusses' top chord members; and "many of the

---

[2]McCathern testified that those repairs had not been done since Joy Tabernacle took possession of the building. His testimony indicated that Joy Tabernacle did not know there was a problem with the roof structure. Miller also indicated that the attic space where the trusses were located was hidden from view and rarely visited, and that any repairs to the trusses had been undertaken before Joy Tabernacle took possession of the property.

truss top chords members have split or cracked to the point that they are no longer structurally sound." *Id.* at 253.

Miller, like Wise, concluded that the roof was unsafe in its current condition and must be repaired or replaced. He opined that "[t]he site built trusses were probably never designed in the first place but were constructed by carpenters on the site," resulting in "poorly constructed nailed splices." *Id.* at PageID 254. He further opined that the roof structure "most likely started to deflect as soon as the structure was finished." *Id.* Miller also concurred that "the east and west exterior walls will require repair or replacement," due to "displacement at the top of the masonry walls . . . ongoing for a long period of time." *Id.* Finally, he concluded that the ceiling collapse was due to "vertical and horizontal movement of the scissor trusses," which caused the "ceiling to crack and loosen the nailed connections of the metal lath to the supports," resulting in a "[l]oose ceiling [that] may fall unexpectedly at any time and . . . presents a hazard to anyone below." *Id.* at PageID 254-55.

After a phone conversation with Brown and an email from her requesting that he address any "decay or deterioration," "insects or vermin" or "water damage," Miller wrote a second version of his report on January 28. R. 22-3, PageID 242. This report was almost identical to the first report with the exception of the following language:

> Minor water staining was observed on some roof trusses and roof deck; however, there was no observed evidence of serious wood decay in the roof trusses or roof deck. Wood decay of the roof structure due to long term roof leaks is not the cause of the problems with the roof structure. There was no evidence of insect or vermin damage to the roof structure.

R. 22-3, PageID 305. Miller later testified that he defined "decay" as "rotten wood," "due to, maybe, an environmental issue, water getting into the … into the attic space and [] compromising the wood in that manner." R. 22-3, PageID 244. He referred to the "cracked

members" in the trusses as "deterioration" occurring due to the faulty roof construction, which resulted in the trusses becoming structurally unsound and not "havi[ing] the strength [they were] intended to have." R. 22-3, PageID 245, 240. He also testified that while the construction "might have been fine for 1927 . . . [he didn't] think it was adequate for the conditions that were imposed," specifically weight of the "dead load" or roof weight, in combination with the "live loads" of snow and wind. R. 22-3, PageID 241.

Based on Miller's reports, State Farm indicated that it would deny Joy Tabernacle's claim. At that point, McCathern and Curry wrote to State Farm to contest the decision. Curry argued that while he agreed with Miller's findings, he additionally found that the "cracking and failure of the truss top chord [was] caused by the snow and ice damming on the [eaves] edge," which caused an "invisible catastrophic loss." R. 23-2, PageID 556-57.

At State Farm's request, Miller responded to McCathern and Curry. Miller found that, based on weather data for December 1-16, "there was no significant weather event related to rain, snow, or wind, and most likely there was no snow anywhere on the roof immediately prior to the ceiling collapse." R. 22-3, PageID 322. In response to McCathern's claim that the cracks in the trusses must have been recent, Miller replied that while he could not ascertain when the cracks formed, "the cracks likely formed at different times," with the primary reason being "the sustained high dead load bending stresses," although "[h]eavy snow loads prior to December, 2012 may have had a contributory effect on the truss member cracking." R. 22-3, PageID 325. He concluded that the "horizontal deflection at the top of the walls was . . . a condition that has occurred over a long period of time." *Id.* Miller also opined that "[a]ge is an issue" because "wood has decreased strength values when subjected to high long term loading," and the resulting tensions can lead to "nails loosening over many years." R. 22-3, PageID 328. Miller

reiterated that "[n]o significant decay that was hidden from view was observed that could be the cause of the plaster ceiling collapse." R. 22-3, PageID 329.

State Farm ultimately did deny Joy Tabernacle's claims related to the ceiling collapse as well as subsequent water damage, eventually cancelling its coverage altogether. Joy Tabernacle brought suit in state court alleging breach of contract as well as violations of the Uniform Trade Practices Act, Mich. Comp. Laws § 500.2006. State Farm removed the suit to federal district court, where both parties moved for summary judgment. The district court granted State Farm's motion for partial summary judgment, determining that the collapse was "excluded from coverage pursuant to the policy's exclusions for damage resulting from '[s]ettling, cracking, shrinking, expansion,' as well as for faulty design." *Joy Tabernacle-The New Testament Church v. State Farm Fire and Cas. Co.*, No. 13-cv-11650, 2014 WL 3563468, at *7 (E.D. Mich. July 18, 2014). It found that the evidence showed that the loss was the result of "the manner in which the roof trusses were constructed many years ago when the church was built." *Id.* The court also determined that the extension of coverage for collapse was unavailable because Joy Tabernacle did not produce any evidence that "hidden decay"—interpreted narrowly to denote only "organic rot"—had caused the collapse, and thus "there is no question of fact that none of the listed perils for which coverage would apply were the cause of the damage."[3] *Id.* at *6, *5. The court then denied Joy Tabernacle's motion for reconsideration, based on the same grounds. R. 36, Page ID 1024-1027. Joy Tabernacle appealed, arguing that the district court erred in applying a narrow definition of "decay" when interpreting the perils covered in the policy's collapse extension and in applying the policy's general exclusions to the provisions of the collapse extension.

---

[3]The court also issued a Consent Order dismissing without prejudice Joy Tabernacle's claims against State Farm for water damage, as the parties had agreed to binding arbitration of such claims. Those claims are not before this court.

## II. ANALYSIS

### A. Standard of Review and Applicable Law

We review *de novo* a district court's grant of summary judgment. *Montell v. Diversified Clinical Servs. Inc.*, 757 F.3d 497, 503 (6th Cir. 2014). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, even when the parties file cross-motions for summary judgment, if genuine issues of material fact exist, summary judgment is not necessarily appropriate. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001).

In a diversity suit, we apply the substantive law of the forum state—in this case, Michigan—anticipating "how the relevant state's highest court would rule in the case." *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012) (internal quotation marks omitted). Where the Michigan Supreme Court has not addressed the pertinent issues, "we must predict how the court would rule by looking to all the available data." *Id.* at 608 (internal quotation marks omitted). "Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). In addition, Michigan courts may view the decisions of other states as "instructive" and use them as a guide. *Wells Fargo Bank, N.A. v. Null*, 847 N.W.2d 657, 674 (Mich. Ct. App. 2014).

Michigan courts treat insurance contracts like any other contract. *Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012); *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). "[T]he court's role is to 'determine what the agreement was and effectuate the intent of the parties.'" *Hunt v. Drielick*, 852 N.W.2d 562, 565 (Mich. 2014) (quoting *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (1992)). Determining intent involves a two-part

analysis: the court must first determine if coverage exists, and then if an exclusion applies. *Id.* The insured has the burden of proving coverage, while the insurer must prove that an exclusion is applicable. *Id.*

Where the language of a contract is clear and unambiguous, the court should give the contractual language "full effect according to its plain meaning unless it violates the law or is in contravention of public policy." *Stryker*, 735 F.3d at 354 (quoting *Westfield Ins. Co. v. Ken's Serv.*, 815 N.W.2d 786, 789 (Mich. Ct. App. 2012)). The meaning of a contract is a question of law, *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003), and "reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings," reading the pertinent language in context, *Henderson v. State Farm Fire and Cas. Co.*, 596 N.W.2d 190, 194 (Mich. 1999). Where there is no clear prior legal meaning for a word or phrase, Michigan courts consult a dictionary such as Webster's, *Citizens Ins. Co. v. Pro-Seal Serv. Grp., Inc.*, 730 N.W.2d 682, 687 (Mich. 2007), looking for "specific and well recognized" meanings, *Henderson*, 596 N.W.2d at 194, and avoiding "technical, constrained constructions," *Singer v. American States Ins.*, 631 N.W.2d 34, 37 (Mich. Ct. App. 2001). Courts must give effect to all words, phrases, and clauses in interpreting a contract, avoiding interpretations that would render any part of the contract surplusage or nugatory. *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003).

"[E]xclusionary clauses in insurance policies are strictly construed in favor of the insured." *Hunt*, 852 N.W.2d at 565-66 (quoting *Churchman*, 489 N.W.2d at 434). However, "[c]lear and specific exclusions must be enforced," as a court cannot hold an insurance company liable for a risk it did not assume. *Hunt*, 852 N.W.2d at 566 (quoting *Group Ins. Co. of Mich. v. Czopek*, 489 N.W.2d 444, 447 (Mich. 1992)).

### B. The Policy's Extension of Coverage for Collapse

The collapse policy extension covers loss resulting from "decay that is hidden from view." R. 22-2, PageID 204. Joy Tabernacle argues that "decay" should be defined broadly to include "gradual and progressive decline," while State Farm argues that the panel should affirm the district court's restriction of "decay" to "organic rot."

No definitive guidance is found in the contract itself, and so we turn to dictionaries to determine the plain meaning of "decay." Dictionaries indicate that "decay" encompasses both "organic rot" and a broader reference to a general decline or degeneration over time. For example, the Oxford English Dictionary's pertinent definitions of "decay" include both "progressive decline" and "the destructive decomposition or wasting of organic tissue; rotting."[4] Decay Definition, www.oed.com, http://www.oed.com/view/Entry/48067?rskey=AuzhZl&result=1&isAdvanced=false#eid (last visited Apr. 28, 2015). The Merriam-Webster Dictionary offers similar definitions: "the process or result of being slowly destroyed by natural processes," and "the slow loss of strength, health, etc. of a building, area, etc." Decay Definition, www.Merriam-Webster.com, http://www.meriam-webster.com/dictionary/decay (last visited Apr. 28, 2015).

Joy Tabernacle argues that a recent, unpublished, decision by Michigan's Court of Appeals offers support for determining that "decay" should be given an "ordinary, plain meaning" that encompasses a "generalized definition of decomposition." *Hani & Ramiz, Inc. v. North Pointe Ins. Co.*, No. 316453, 2014 WL 523492, at *3 (Mich. Ct. App. Feb. 4, 2014).[5] In

---

[4]The Oxford English Dictionary defines "rot" as "decay or decomposition," and specifically as "decay in timber or in the wood of standing trees, or in certain other plant-derived construction materials," noting that its use extends to "decomposition or deterioration of rock, stone, or stone-built structures." Rot Definition, www.oed.com, http://www.oed.com/view/Entry/167684?rskey=9FutOz&result=1&isAdvanced=false#eid, (last visited May 20, 2015).

[5]Other federal and state courts also have opted for the common, broader reading of "decay." *See PMW Real Estate Mgmt., LLC v. State Farm Fire and Cas. Co.*, No. 2:11cv1395, 2013 WL 3993759, at *1, *5 (W.D. Pa. Aug. 5,

*Hani & Ramiz*, a grocery store roof collapsed from the weight of snow and ice, its wooden trusses weakened due to treatment with flame-retardant chemicals. *Id.* at *1. There, relying on a common dictionary definition of "decay" as "a gradual and progressive decline" and rejecting a scientific definition of "biological degradation," the court determined that the insurance policy's collapse coverage included "decay" consisting of deterioration due to the chemical treatment of wood. *Id.* at *3. The *Hani* court of appeals decision is persuasive authority in Michigan.

Instead of relying on the Michigan Court of Appeal's definition, however, the district court turned to an earlier, unpublished case from the Western District of Michigan, *Travelers Property Casualty of America v. Eyde Co.*, No. 5:05-CV-168, 2007 WL 107667, at *1, *6 (W.D. Mich. Jan. 9, 2007), to support a narrower, technical reading of "decay." But even under the *Eyde* definition, coverage may be warranted based on the facts of this case. In *Eyde*, the court found that where the roof of a building constructed in 2001 collapsed in 2005 due to defective design (which caused nails to loosen from the trusses and the overall strength of the structure to weaken is only 4 years), the "decay" exception in the collapse coverage did not apply. *Id.* at *6. The court defined "decay" narrowly as "organic rot or deterioration from a normal state." *Id.* Although denying coverage on its facts, the *Eyde* opinion discusses with approval two other cases—*Stamm Theatres, Inc. v. Hartford Casualty Insurance Company*, 113 Cal. Rptr. 2d 300 (Cal. Ct. App. 2001), and *Northeastern Center Inc. v. St. Paul Fire and Marine Insurance Company*, No. 1:03-CV-246TS, 2006 WL 842396, at *1 (N.D. Ind. Mar. 28, 2006). The *Eyde* court's analysis of those cases—both of which found that insurance coverage existed in factual settings analogous to our own—is instructive.

---

2013) (decay as "decomposition, disintegration or decline in quality"); *Quality Time, Inc. v. West Bend Mut. Ins. Co.*, No. 12-1008-JTM, 2013 WL 474289, at *1, *13 (D. Kan. Feb. 7, 2013) (decay as "gradual deterioration or degradation, without organic decomposition"); *Bardis v. Stinson*, No. L-5738-11, 2014 WL 4996291, at * 1, *5 (N.J. Sup. Ct. App. Div. Oct. 8, 2014) ("decay" as "a gradual decline in strength").

The courts in *Stamm Theatres* and *Northeastern Center*, construing policies similar to the one issued to Joy Tabernacle, concluded that "hidden decay" was a cause of loss where the buildings at issue had been exposed to the elements over several decades. In *Stamm Theatres*, the *Eyde* court reasoned, the court found that the 49-year-old building collapsed due not only to the passage of time but also—as evidence suggested—because of organic decay of the wood trusses. *Eyde*, 2007 WL 107667, at \*5 (quoting *Stamm Theatres*, 113 Cal. Rptr. 2d at 308). *Stamm Theatres* found coverage based on the testimony of the plaintiff's wood expert, who opined that the roof trusses collapsed due to "deterioration at the cellular level caused by the migration of water molecules in and out of the wood over the years, as the ambient humidity fluctuated." *Stamm Theatres*, 113 Cal. Rptr. 2d at 308.

The *Eyde* court also considered *Northeastern Center*, in which a 90-year old building was in danger of collapse "when the ties and mortar holding together bricks deteriorated leading to a progressive failure in strength of a wall." *Eyde*, 2007 WL 107667, at *6. *Eyde* explained that although the *Northeastern Center* court found the word "decay" to entail the broad, common definition, it also found coverage because "the Defendant [had] not carried its burden in showing the materials or designs used were faulty when considered in relation to the time in which the building was built or that a building can be considered defective when it lasted 90 years before structural repairs were necessary." *Id.* (quoting *Northeastern Center*, 2006 WL 842396, at *6). The court in *Eyde* concluded that in *Northeastern Center* "the age of the building lent credibility to the argument that there was a deterioration of the ties and mortar rather than merely a design defect" but found that reasoning to be inapplicable to its own case because the building in *Eyde* had "stood for less than five years." *Id.*

Even as it adopted a definition of "decay" as "organic rot or deterioration from a normal state," the *Eyde* court concluded that its definition "is not so narrow as to foreclose recovery for situations described in *Stamm Theatres* or *Northeastern Center*" because those cases, too, involved "the deterioration of a matter from its normal state" or "material degrading from its natural state." *Id.* In light of this reasoning, Joy Tabernacle has likely carried its burden of proving coverage under the collapse extension of the policy. The record shows a gradual degradation of the organic materials used to construct the roof and walls over time: "deterioration" which Miller, State Farm's expert, described as likely beginning "as soon as the structure was finished" in 1927 and resulted in the wood trusses eventually not "hav[ing] the strength [they were] intended to have." R. 22-3, PageID 245, 254, 240. Miller also specifically found that "[a]ge is an issue" because "wood has decreased strength values when subjected to high long term loading." [6] R. 22-3, PageID 328. Wise, an engineer hired by Joy Tabernacle, opined that "seasonal changes in humidity" caused movement in the roof system. R. 23-2, PageID 520. Miller concluded that although neither a specific weather event in the weeks leading up to the collapse nor general water damage was a cause of loss, R. 22-3, PageID 322, "[p]rior weather events may have had a contributory effect on loosening of the plaster ceiling." *Id.* at PageID 330.

We find that the deterioration of the 90-year old church roof structure was unlike the four-year-old building with loosened nails at issue in *Eyde*, and more similar to *Eyde's* description of the older buildings in *Stamm Theatres* and *Northeastern Center* in which wood and mortar weakened over time due to age and extended exposure to humidity and weather.

---

[6]We also note that the record does not contain any information regarding the normal life span of these wooden trusses, indicating if they have aged prematurely or have endured a natural decline. See, e.g., *Hani & Ramiz*, 2014 WL 523492, at * 2 (citing the lower court's finding that "it's undisputed that the trusses had a shelf life of 50 to 100 years").

*Eyde*'s analysis suggests that deterioration and degradation of the wooden roof structure and walls over a long period of time may qualify as "decay" that was "hidden" and such decay may be what "caused in part" the ceiling collapse. Therefore such loss could be covered under the policy even though "defective material or methods in construction" also "contribute[] to the collapse." R. 22-2, PageID 204. The record before us presents a dispute of material fact regarding the role that humidity and water damage played in the weakening of the wood trusses of the Joy Tabernacle church over its 85 years of existence. Summary judgment was therefore inappropriate.

### C. Applicability of the Policy's General Exclusions

State Farm bears the burden of proving that the exclusions—here the exclusions for cracking and defective design or construction—are applicable. *Hunt*, 852 N.W.2d at 565. While "clear and specific exclusions must be enforced," the court also must strictly construe exclusionary clauses in favor of the insured. *Id.* at 566 (internal quotation marks omitted), Michigan courts, moreover, read contracts "as a whole, giving harmonious effect, if possible, to each word and phrase." *Stryker*, 735 F.3d at 355 (quoting *Wilkie*, 664 N.W.2d. at 781 n.11).

Read in context and in conjunction with the collapse extension, the general exclusions for defective design and cracking do not foreclose coverage if the collapse extension is triggered. A specific contract provision generally controls over a related but more general contract provision. *See DeFrain v. State Farm Mut. Auto. Ins. Co.*, 817 N.W.2d 504, 509 n.22 (Mich. 2012). Therefore, while the extensions of coverage are "[s]ubject to the terms and conditions applicable in SECTION I" of the policy (Section I encompassing the policy exclusions), R. 22-2, PageID 203, where the plain language of the collapse extension clearly negates aspects of those general exclusions, the court must interpret the specific provisions of the policy both as controlling and

so as to avoid rendering any of its words or phrases surplusage or nugatory, *Klapp*, 663 N.W.2d at 453.

The policy contains a general exclusion for "faulty, inadequate or defective" "design" "construction" and "materials." R. 22-2, PageID 203. The collapse extension then explicitly provides that where an enumerated "cause of loss"—such as "decay"—has "caused in part" a collapse after construction is complete, the policy extends coverage even if "use of defective material or methods in construction" also "contributes to the collapse." R. 22-2, PageID 204. Under the specific terms of the collapse extension, defective materials or methods of construction cannot preclude coverage where an enumerated cause of loss is the other cause of collapse. *See Eyde*, 2007 WL 107667, at *4-*5 (construing similar policy language to provide coverage if collapse occurs after construction and is caused in part by an enumerated peril as well as defective construction). The record here indicates that it was precisely the construction rather than the design of the church that was defective. Miller, State Farm's expert, opined that "the site built trusses were probably never designed in the first place but were constructed by carpenters on the site," R. 22-3, PageID 254, and even found the construction "might have been fine for 1927," R. 22-3, PageID 241. Based on this record, it appears that any general exclusion for defective design or construction would not be applicable.

The specific language of the collapse extension similarly addresses and clarifies the application of the general exclusion for loss due to "settling, cracking, shrinking or expansion." The collapse extension's definition of "collapse" provides that: "[a] building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." R. 22-2, PageID 204. This language explains that "cracking" and other such signs

of structural infirmity alone do not qualify as collapse, and therefore coverage for collapse is precluded in such instances, just as is provided for in the general exclusion for "cracking." *See Pioneer State Mut. Ins. Co. v. Splan*, No. 220477, 2003 WL 1361552, at *2 (Mich. Ct. App. Mar. 18, 2003) (distinguishing collapse from settling, cracking, etc.). However, here the parties do not dispute that the church ceiling partially collapsed.[7] To find that a general exclusion for "cracking" precludes coverage where collapse actually occurred renders the entire collapse extension nugatory, as the collapse of a structure often involves the cracking of beams and walls. *See Stamm Theatres*, 113 Cal. Rptr. 2d at 307 ("It is difficult indeed to imagine a building collapsing without any of these symptoms [settling, cracking, shrinkage, bulging or expansion] appearing.")

Instead of construing the language of the policy directly in light of the facts of this case, the district court relied heavily on two unpublished opinions by the Michigan Court of Appeals to find that the general exclusions for defective design and cracking precluded coverage of Joy Tabernacle's claim under the "concurrent causation theory." Joy-Tabernacle-The New Testament Church, 2014 WL 3563468, at *5-6; R. 36, Page ID 1026; *Splan*, 2003 WL 1361552, at *3-4; *Suttmann v. Wolverine Mut. Ins. Co.*, No. 211904, 1999 WL 33326878, at *3 (Mich. Ct. App. Dec. 21, 1999). However, the policies in those cases differed from the one at issue here in crucial respects, rendering these cases inapplicable. Although Michigan rejects "concurrent causation theory" in the context of insurance liability, this principle appears to apply only where one provision nullifies another and there is no explicit language in the contract reconciling the two provisions. In *Splan* and *Suttman*, cases involving structural infirmity and constructive

---

[7]The policy defines "collapse" as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." R. 22-2, PageID 204. In the case of Joy Tabernacle, a large portion of the church ceiling abruptly fell, and as a result, the building cannot be used or occupied. R. 22-3, PageID 260 ("Loose ceiling may fall unexpectedly at any time and this presents a hazard to anyone below.").

collapse rather than actual collapse, the courts found that where an insurance contract covered collapse caused by the weight of snow or ice but also contained a general exclusion for defective design or construction, no coverage existed. *Splan*, 2003 WL 1361552, at \*4; *Suttman*, 1999 WL 33326878, at \*3. Joy Tabernacle's policy, however, contains explicit language in which the insurer extends coverage in the case of collapse caused in part by an enumerated cause of loss, [8] including "decay" that is "hidden" "even if use of defective material or methods in construction . . . contributes to the collapse." R. 22-2, PageID 204. The policy's collapse extension also reconciles that coverage with the general exclusion for cracking. In light of such language, State Farm cannot carry its burden of proving that the general exclusions in the Joy Tabernacle policy apply.

### III. CONCLUSION

We REVERSE the district court's grant of partial summary judgment to State Farm and REMAND the case for further proceedings in accordance with this opinion.

---

[8] The Joy Tabernacle collapse coverage also covers losses due to "specified causes of loss" including snow and ice, even if defective design were also a cause; no such language was apparently present in either the *Splan* or *Suttman* policies.