# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| FEENIX PARKSIDE LLC,<br><br>                    Appellant,<br><br>          v.<br><br>BERKLEY NORTH PACIFIC and<br>CONTINENTAL WESTERN<br>INSURANCE COMPANY,<br><br>                    Respondents. | No. 77303-8-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION<br><br><br><br>FILED: April 8, 2019 |

APPELWICK, C.J. — The ceiling of a commercial building owned by Feenix partially collapsed. Feenix sought coverage under the insurance policy's coverage for collapse due to decay, claiming the collapse was caused by a gradual decline in strength, soundness. Berkley denied coverage for the loss. The trial court granted summary judgment to Berkley on the coverage issue. We reverse.

## FACTS

Feenix Parkside LLC (Feenix) owns a single story commercial building in Auburn, Washington. The building was built approximately 40 years ago, around 1979. On or about July 4, 2015, a portion of the building's roof truss system failed, and that portion of the roof collapsed. At that time, Feenix was insured by a Continental Western Insurance Company policy issued by Berkley North Pacific (Berkley). Feenix submitted a claim to Berkley. Berkley retained Independent

Adjuster Rob Stone from McLarens Young and Engineer Mark Schaefer with Pacific Engineering Technologies Inc. (PET) to investigate the claim.

Stone and Schaefer initially inspected the building on July 8, 2015. Schaefer again inspected the building on July 13, 21, and 27, 2015. Based on his inspections and research, Schaefer performed a structural analysis of the roof truss system. In his opinion, the roof trusses failed when the top chord members fractured as a result of applied tension perpendicular to the wood grain immediately adjacent to the rear exterior bearing wall. He determined that the roof trusses failed because of two concurrent factors: (1) the configuration of the truss plate connection adjacent to the rear exterior bearing wall had inadequate strength to resist the applied loads, and (2) higher than normal temperatures reduced the strength of the wood trusses by up to 30 percent.

In a letter dated August 19, 2015, Berkley denied Feenix's claim because the loss was caused by "defective methods in construction and excessive temperatures in the attic," which are not covered causes of loss under the policy's collapse coverage.

Feenix retained CT Engineering Inc. to conduct an independent investigation of the loss shortly after receiving Berkley's denial. CT Engineering concluded,

> [W]ater penetrated thru [sic] the upper layer of roofing and collected between the two layers providing a concealed, encapsulated water delivery system. The water between the roofing layers sought the drain location although [sic] became trapped. As the water volume increased, so did the pressure on the old roofing layer which we believe, slowly allowed the water to penetrate into the interior of the building near the roof drains. The water wicked through the blocking

and delivered moisture to the truss bearing ends. In support of this, water staining is clearly visible in both the blocking and truss bearing ends [on] each side of the roof drains.

CT Engineering also wrote, "It is our opinion that the cause of the truss collapse is due to the combined effects of both an elevated temperature in the attic space due to solar radiation gain (125 -150 degrees) as well as a moisture content exceeding 19% for an extended period of time." Based on CT Engineering's findings, Feenix requested that Berkley reconsider its denial of coverage.

As a result of Feenix's letter, Berkley reopened its investigation and instructed PET to determine whether "'hidden decay'" contributed to the roof collapse. On July 13, 2016, PET revisited the building site and inspected portions of the original roof sheathing and roof trusses still onsite. Schaefer did not alter his opinions on the cause of the collapse, and noted the following:

- Visual examination of the failure surfaces in the top chord members of trusses in place shortly after the collapse showed no evidence of wood decay in the failure surface.

- Examination of the failure surfaces in the top chord members truss pieces stored on site in 2016 showed no evidence of wood decay in the failure surface.

- Examination of the failure surfaces in the top chord members truss pieces stored at the MDE [Inc.] in 2016 showed no evidence of wood decay in the failure surface. The darkened wood along the shafts of nails that were exposed in the failure plane appears to be iron staining, which is a common phenomenon in wood where elevated moisture is present at some point. Iron staining does not reduce the strength of the affected wood.

Following PET's supplemental report, Berkley confirmed its denial of Feenix's claim.

3

On September 23, 2016, Feenix sued Berkley. Berkley and Feenix filed cross motions for summary judgment on the issue of coverage for the building roof collapse. On August 4, 2017, the trial court granted Berkley's motion for summary judgment and denied Feenix's motion. On September 18, 2017, the trial court entered an amended order on the parties' cross motions, which reflected all submissions and materials considered by the trial court at the summary judgment hearing. The amended order did not alter or modify the legal conclusions and findings of fact in the trial court's August 4, 2017 orders. Feenix appeals.

## DISCUSSION

Feenix makes two arguments. First, it argues that the trial court erred in finding the term "decay" unambiguous in Berkley's insurance policy. Second, it argues that the trial court erred by construing the term "system" against Feenix and in favor of Berkley.

### I.   Standard of Review

An order granting summary judgment is reviewed de novo, "with the reviewing court performing the same inquiry as the trial court." Ski Acres, Inc. v. Kittitas County, 118 Wn.2d 852, 854, 827 P.2d 1000 (1992). When we review a summary judgment order, we must consider all evidence in favor of the nonmoving party. Keck v. Collins, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); TracFone Wireless, Inc. v. Dep't of Revenue, 170 Wn.2d 273, 281, 242 P.3d 810 (2010).

4

II.  Insurance

Courts in Washington construe insurance policies as the average person purchasing insurance would, giving the language a fair, reasonable, and sensible construction. Vision One, LLC v. Phila. Indem. Ins. Co., 174 Wn.2d 501, 512, 276 P.3d 300 (2012). Undefined terms are to be given their ordinary meaning. Id. The entire contract must be construed together in order to give force and effect to each clause. Wash. Pub. Util. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam County., 112 Wn.2d 1, 10, 771 P.2d 701 (1989). The court must enforce the contract as written if the language is clear and unambiguous. Id. If the language on its face is fairly susceptible to two different but reasonable interpretations, the contract is ambiguous, and the court must attempt to discern and enforce the contract as the parties intended. Id. at 10-11. In the event of an ambiguity, the contract will be construed in favor of the insured. Id. at 11.

A. Burden

Property insurance policies generally fall into two categories: named-peril and all-risk. 174 Wn.2d at 513. "Named perils" policies provide coverage only for the specific risks enumerated in the policy and exclude all other risks. Id. All-risk policies, on the other hand, provide coverage for all risks unless the specific risk is excluded. Id. In both types of property insurance, coverage is commonly triggered—or excluded—when a specified peril "'causes'" a loss. Id. at 514.

Determining whether coverage exists is a two-step process. McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 731, 837 P.2d 1000 (1992). The insured must show the loss falls within the scope of the policy's insured losses. Id.

To avoid coverage, the insurer must then show the loss is excluded by specific policy language. Id.

B. The Policy

Here, the coverage form states, "[Berkley] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."

The Causes of Loss—Special Form (COL Form) states,

A. Covered Causes of Loss

When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

1. Excluded in Section B., Exclusions; or
2. Limited in Section C., Limitations;
that follow.

B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   a. Ordinance Or Law
      . . . .
   b. Earth Movement
      . . . .
   c. Governmental Action
      . . . .
   d. Nuclear Hazard
      . . . .
   e. Utility Services
      . . . .
   f. War and Military Action
      . . . .
   g. Water
      . . . .
   h. "Fungus", Wet Rot, Dry Rot And [sic] Bacteria
      . . . .

6

3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

. . . .

D. Additional Coverage - Collapse

The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in D.1. through D.5. below.

1. With respect to buildings:

a. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

. . . .

2. We will pay for direct physical loss or damage to Covered property, caused by collapse of a building or any part of a building that is insured under this Coverage Form . . . if the collapse is caused by one or more of the following:

a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

b. Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

c. Insect or vermin damage. . . .

d. Weight of people or personal property;

e. Weight of rain that collects on a roof;

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the court of the construction, remodeling or renovation. However, if the collapse occurs after construction,

7

remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss of damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

. . . .

E. Additional Coverage—Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria

1. The coverage described in E.2 and E.6 only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

. . . .

G. Definitions

. . . .

(2) "Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

. . . .

c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning, or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

(Boldface omitted.)

C. <u>Meaning of Decay</u>

Feenix sought coverage for collapse under section D.2.b. Feenix asserts first that the undefined term "decay" in that section is ambiguous, and must be

construed in its favor. Below, Feenix proposed that the trial court define "decay" as "a gradual decline in strength, soundness," from Webster's Ninth New Collegiate Dictionary 329 (1988). It offered alternative definitions of "decay": "to decline from a sound or prosperous condition," and "to undergo decomposition." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/decay (LAST VISITED March 28, 2019).

The trial court rejected Feenix's argument that "decay" was ambiguous in the policy, stating,

> I, however, do not believe that the term decay [sic], as used in the policy, is an ambiguous [sic] and the idea that it would mean . . . a decline in strength I don't find to be a reasonable use of the term in the context of the policy. Any structural failure could ostensibly be defined as decay if that more generalized term were used.
>
> . . . .
>
> Additionally, I think it is important that the -- as defined in the policy, it's not simply decay, but it is decay hidden from view, and . . . that phrase becomes superfluous unless it actually means some kind of material decomposition that is visible rather than more general just weakening of the material over time that doesn't have any visual component to it.
>
> Otherwise, the phrase hidden from view has no meaning in the contract. And as the defendants have argued, it is the court's job to interpret contractual language in total and to give meaning to it all.
>
> And so here, I think that when read in the context of defining a cause of a collapse, the only reasonable interpretation is one that indicates some kind of decomposition of the material, and whether that's rot. You know, in the specific instance of wood, that may be rot.

9

To determine the ordinary meaning of an undefined term, our courts look to standard English language dictionaries. Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877, 784 P.2d 507 (1990).

Citing Webster's Ninth at 329, Feenix urges the court to use the definition of "decay": "a gradual decline in strength, soundness." The complete definition of "decay" upon which Feenix relies is "a gradual decline in strength, soundness, or prosperity or in degree of excellence or performance." Id.

Webster's Third New International Dictionary also defines "decay" as "the condition of a person or thing that has undergone a decline in strength, soundness, or prosperity or has been diminished in degree of excellence or perfection." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 584 (2002). It alternatively defines "decay" as "the material process of dilapidation : wasting or wearing away." Id. It also offers the definition, "Rot; [specifically]: the aerobic decomposition of proteins chiefly by bacteria in which the products of putrefaction are completely oxidized to stable compounds having no foul odors." Id.

To support its proffered definition of decay, Feenix cites non-Washington authority. In a Sixth Circuit case, a building's insurance policy covered "loss resulting from 'decay that is hidden from view.'" Joy Tabernacle-The New Testament Church v. State Farm Fire & Cas. Co., 616 Fed. Appx. 802, 808 (6th Cir. 2015). Because there was no definitive guidance in the contract itself, the court turned to dictionaries to determine the plain meaning of "decay." Id. The dictionaries indicated that "decay" encompasses both "organic rot" and a broader reference to a general decline or degeneration over time. Id. The court held that

that the insured "likely carried its burden of proving coverage under the collapse extension of the policy." Id. at 810. It explained that

> the deterioration of the 90-year old church roof structure was unlike the four-year-old building with loosened nails . . . and more similar to . . . the older buildings . . . in which wood and mortar weakened over time due to age and extended exposure to humidity and weather.

Id. at 810-11.

Feenix also cites Stamm Theaters, Inc. v. Hartford Casualty Insurance Co., 93 Cal. App. 4th 531, 113 Cal. Rptr. 2d 300 (2001). In Stamm Theaters, a theater built around 1948 was in danger of imminent collapse when wood trusses gave way but showed no signs of rot. Id. at 534-35. Reversing the trial court's narrow reading of "decay" as including only organic rot, the California Court of Appeals adopted the broader definition of "the gradual loss of strength." Id. at 537-38, 542-43.

Additionally, Feenix cites Easthampton Congregational Church v. Church Mutual Insurance Co., 322 F. Supp. 3d 230 (D. Mass. 2018), aff'd, 916 F.3d 86 (1st Cir. 2019). In that case, the insurer denied coverage when a church ceiling failed and fell to the floor. Id. at 233-34. The question for the court was whether the church produced evidence establishing that decay that was hidden from view and unknown to the church contributed to the collapse. Id. at 236. The court turned to dictionary definitions and found that the definitions include both a broad definition and a narrower one which referenced rot. Id. at 236. The court stated,

> The most reasonable reading of the word "decay" as it is used in the Policy is that it refers to the broader concept of the word. This is because the Policy elsewhere uses the term "rot" in an exclusion for " 'Fungus,' Wet Rot, Dry Rot and Bacteria." If Church Mutual wanted

> to limit coverage for collapse to collapse caused or contributed to by "rot," as opposed to "decay," it could have done so. It did not, and the only reasonable implication is that the plain and ordinary meaning of "decay" as used in the Policy encompasses decay in the broader sense of a gradual deterioration or decline in strength or soundness.

Id. at 236-37. The court held that the church had shown that the failure of the ceiling was caused, at least in part, by such a gradual deterioration or decline in strength or soundness. Id. at 237.

Berkley argues that Feenix's broader definition of "decay" is unreasonable, and nothing more than an attempt to "recharacterize the perils of excessive heat (in the attic space) and excessive moisture content in the trusses . . . as 'decay.'"

But, as the court reasoned in Easthampton, if Berkley wanted to limit coverage for collapse to collapse caused or contributed to by "rot," as opposed to "decay," it could have done so. It did not. The policy here is nearly identical to the policy in Easthampton. The policy references "'Fungus', Wet Rot, Dry Rot, And Bacteria" when it initially excludes them from covered causes of loss or damage in section B.1.h. And the policy again mentions fungus, wet rot, dry rot, and bacteria under section E, which provides "Additional Coverage - Limited Coverage," for those losses. The only reasonable implication is that the plain and ordinary meaning of "decay," as used in the policy, is not limited to organic rot. Rather, it encompasses "decay" in a broader sense.

Berkley also contends that Feenix's definition of "decay" is substantially similar to "deterioration," a term that the policy specifically references as an exclusion. It argues that "deteriorate" means "'to grow worse; degenerate; to weaken or disintegrate; decay.'" And, because the policy contains a specific

12

reference to "deterioration," "decay" necessarily means something other than to grow worse over time, i.e., gradually lose strength, soundness, prosperity or degree in excellence.

The policy provides an exclusion for deterioration at COL Form section B.2.d(2): "We will not pay for loss or damage caused by or resulting from any of the following: . . . Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself."

Though the policy uses both terms, a distinction between decay and deterioration is not so apparent as Berkley would argue. In Sprague v. Safeco Insurance Company of America, 174 Wn.2d 524, 529-30, 276 P.3d 1270 (2012), the court turned to the dictionary for a definition of the term "rot" which was not defined in the policy. It noted: "'Rot' is defined: '1 a : to undergo natural decomposition : decay as a result of the action of bacteria or fungi . . . b : to become unsound or weak . . . 2 a : to go to ruin : DETERIORATE." Id. at 530 (alterations in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1976 (1993)). The court continued, "Stated simply, 'rot' describes the process of deterioration." Id. The same dictionary also references deterioration in its definition of decay: "DECAY indicates deteriorating change, often gradual, from a sound condition or perfect state." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 584 (2002).

We must strictly and narrowly construe exclusions, such as the exclusion for deterioration. See Campbell v. Ticor Title Ins. Co., 166 Wn.2d 466, 472, 209 P.3d 859 (2009). Insurance policies are liberally construed to provide coverage

13

wherever possible. <u>W. Nat'l Assurance Co. v. Shelcon Constr. Grp., LLC</u>, 182 Wn. App. 256, 261, 332 P.3d 986 (2014). And, because Berkley did not define "decay" in the policy, the term must be interpreted in a way the average purchaser of insurance would understand it, and any ambiguity is construed against the insurer and in favor of the insured. <u>Vision One</u>, 174 Wn.2d at 512. The broader definition of "decay," a gradual decline in strength or soundness, is the more reasonable manner to construe the term.

In granting summary judgment to Berkley, the trial court stated,

> At best, Mr. [Benjamin] McCann states that decay on the support sleeper allowed water intrusion into the roof, which then . . . combined with excessive heat over time weakened the structural integrity and the roof then collapsed. But he doesn't point to specific areas of decay that led to the collapse.

> As [Berkley's counsel] discussed further this morning, there are several spots throughout, the sleeper, the end of one of the trusses, a couple of spots where decay was noted, but Mr. McCann actually testified that there was no decay in the trusses. And that is -- this is at his deposition page 56 lines 3 to 12, and that the wood's exposure to water and heat over time was not the same as decay. It wasn't synonymous with decay.

Feenix's expert testified in his deposition, "The sleeper obviously sits on the trusses, and it's in a decayed state, and I'm saying that it had a factor in the decay -- or the collapse of the trusses." He continued, "[W]hat I am saying is that I did not find any decay in the truss members themselves." And, when asked if "moisture content of wood exceeding 19 percent" was the "equivalent of wood decay," McCann answered, "No." The record indicates the sleeper had wet rot and the trusses did not. In the context of his testimony, McCann was using "decay" to indicate "wet rot." Using that definition, the trial court could have correctly

concluded there was no evidence of decay in the trusses. But, that is not the proper definition of "decay." That conclusion was not appropriate under the correct definition.

The trial court also found that the phrase "hidden from view" would be rendered meaningless unless decay requires "some kind of material decomposition that is visible rather than more general just weakening of the material over time that doesn't have any visual component to it." But, the phrase "decay that is hidden from view" must be interpreted in context of the entire sentence which concludes "unless the presence of such decay is known to an insured prior to collapse." Decay that is not hidden from view is not covered. Decay that is hidden from view is not covered if known to an insured prior to collapse. Coverage turns on what the insured could have known by viewing the property or what the insured did know. Presumably known risks could be addressed prior to collapse.

The trial court erred in concluding that the "only reasonable interpretation" of "decay" is one that indicates some kind of decomposition of the material, and rejecting Feenix's definition.

D. Issue of Fact

Feenix asserts that it raised a material issue of fact as to whether decay, under the broader definition it advanced, caused the collapse. Feenix's expert opined,

> [T]he cause of the truss collapse is due to the combined effects of both an elevated temperature in the attic space due to solar radiation gain (125 – 150 degrees) as well as a moisture content exceeding

19% for an extended period of time. The net effect of these conditions cause a reduction in the allowable stresses of the truss top chord by sixty percent.

Thus, Feenix presented evidence of weather conditions—moisture and extreme heat—that caused damage that led to the roof collapse.

The COL Form section B.3 provides,

We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph [B.]1. above to produce the loss or damage.

Feenix states a claim for a covered cause of loss under the collapse coverage. As a result, the exclusion of weather conditions is not applicable.

The expert evidence Feenix offered demonstrates the existence of genuine issues of material fact concerning the cause of the collapse. Therefore, the trial court's grant of summary judgment for Berkley was in error.

E. Water Damage and System

Feenix also argues that the "intrusion of water through the Parkside roof system and the elevated moisture which resulted from it becoming trapped in the roof system over time reduced the strength of the wood trusses, which led to the collapse of the roof system." Feenix asserts that the term "system" in the policy is susceptible to more than one reasonable interpretation, and argues that the definition of "system" can also apply to the "roof system" of the building.

Berkley contends that Feenix's definition inappropriately expands the scope of collapse coverage caused by "water damage," which renders the limited definition in the policy ineffective.

The policy defines "water damage" in this manner:

> Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning, or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

In rejecting Feenix's argument, the trial court stated, "Plaintiff has argued that the roof structure qualifies as [another] system within this definition of water damage, but I have to find that the plaintiff's damage is very strained and simply untenable within the context of the policy."

Under the rule of ejusdem generis, where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent. Cockle v. Dep't of Labor & Indus., 142 Wn.2d 801, 808-09, 16 P.3d 583 (2001). Instead, they are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. Id.

A "roof system" is not the equivalent of a plumbing, heating, or air conditioning system, because those systems are all designed to use water or steam in their operation, while a roof system serves to exclude water. Feenix's argument violates the rule of ejusdem generis and its offered definition of "system" fails.

We reverse.

Appelwick, C.J.

WE CONCUR:

Andrus, J.