**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0390n.06

**No. 10-1564**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Apr 10, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| UNIVERSAL IMAGE PRODUCTIONS, INCORPORATED, also known as Universal Images, a Michigan corporation, )<br><br>Plaintiff-Appellant, )<br><br>v. )<br><br>FEDERAL INSURANCE COMPANY, )<br><br>Defendant-Appellee. ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |

BEFORE: KEITH, GRIFFIN, and STRANCH, Circuit Judges.

GRIFFIN, Circuit Judge.

In this action, plaintiff-appellant Universal Image Productions, Inc. ("Universal") filed suit against defendant-appellee Federal Insurance Company ("Federal"), asserting that Federal wrongfully denied its claim of coverage under a property insurance policy. Following discovery, Federal moved for summary judgment, asserting that Universal's claim of mold and bacteria contamination did not constitute "direct physical loss or damage" as required under the policy. The district court granted the motion, and this appeal followed. We affirm.

I.

Universal is a television post-production company specializing in editing, special effects, and computer graphics. In 1989, Universal signed a lease to occupy space at a three-floor commercial

building located at 26011 Evergreen Road (the "Evergreen building" or "building") in Southfield, Michigan. This lease was the first of a total of eight contracts, which included two leases and six amendments.

In 1997, the lease relevant to the instant action was executed. Pursuant to this agreement, Universal occupied space on all three floors of the building. On August 7, 2002, Universal executed the final amendment to this lease. This amendment terminated the lease with regard to two suites on the third floor, relocating these operations to new space on the first floor. This newly-leased area was to be available on September 1, 2002.

One week after the final amendment was executed, Universal asserts that Southfield experienced heavy rainstorms. Soon thereafter, a strong odor was detected on the first floor of the Evergreen building. Concerned, Universal employee Patricia Dial contacted Jon Datillo, a certified indoor air quality professional. Datillo confirmed the presence of water and a "significant odor consistent with microbial contamination" stemming from the sub-grade duct system on the first floor. He also noted odor in the sump pump. Based upon these observations, Datillo concluded that a "significant microbial contamination likely exist[ed] in the ventilation system," requiring that the heating, ventilation, and air conditioning ("HVAC") system be shut down and isolated to "prevent the emission of microbial spores." Datillo recommended that the health of building occupants be

monitored, that all floors be tested for air quality, and that the HVAC system and areas of water damage be tested and inspected.[1]

Based upon the findings of Datillo, Universal's landlord shut down the HVAC system. Datillo thereafter returned to conduct mold and bacteria testing. These tests revealed a bacterial contamination in the building's ductwork and elevated bacteria in the air. Datillo also discovered the presence of Stachybotrys (black mold) and Penicillium Aspergillus. While the elevations of these molds were not significant, Datillo noted that they were "worthy of attention." Finally, Datillo noted water and high moisture content in the walls throughout the Evergreen building, causing mold and staining. Datillo, however, did not find any "notable airborne contamination" and did not find that evacuation of the building was necessary.[2]

Dan Maser, an expert hired by Universal's landlord, also conducted mold and bacteria testing, the results of which were nearly identical to those of Datillo. Maser did not recommend that Universal evacuate the building, but did recommend that it move its operations from the first floor to the third floor during remediation. Finally, Arthur Carmichael, a mechanical engineer, performed an inspection of the Evergreen building on September 12, 2002. He determined that the placement

---

[1]Datillo also recommended that Universal employee Chris Worth be relocated away from the first floor based upon his ill health. Datillo, however, could not determine whether Worth's illness (bacterial pneumonia) was related to the microbial contamination discovered on the first floor of the Evergreen building.

[2]While Universal claims that Datillo recommended the use of respirators, his deposition testimony indicates to the contrary. There is no admissible, non-hearsay evidence indicating that respirators were required. While Arthur Carmichael, a mechanical engineer, wore a respirator while in the building, he is not qualified to testify regarding the need to take such precautions.

of the building's ductwork caused ground water infiltration in a chronic fashion, creating a "classic environment" for mold growth.[3]

Once the HVAC system was shut down, Universal's business suffered severe disruptions. The diminished ventilation caused temperatures in the building to exceed 100 degrees, causing extreme discomfort.[4] In addition, Universal was required to move all of its operations from the first floor to the third floor of the building. Finally, premature cleaning by the landlord caused duct debris and possible contaminant blowback.

On September 11, 2002, Universal circulated a memorandum to its employees and clients asserting that the air quality on the second and third floors of the Evergreen building was "acceptable" and that "no health threat" existed. Soon thereafter, the landlord provided Universal with its remediation plan. Nevertheless, Universal decided that it would vacate the premises, with the move completed by September 25, 2002. The remediation of the Evergreen building was completed by December 2002. Currently, there is no indication that a mold or bacterial contamination remains in any area of the building.

---

[3]Carmichael also made findings with regard to the possible impact of certain molds on the health of building occupants. However, Carmichael is not qualified to testify regarding mold, bacteria, or the possible health-related effects of such substances.

[4]During oral argument, Universal asserted that the temperature in the Evergreen building was above 100 degrees for "weeks." However, the record citations provided by Universal do not establish the length of time during which such extreme temperatures were experienced. It does appear that the temperature in the building was uncomfortably hot following the HVAC shut-down on August 21, 2002, with temperatures reaching above 100 degrees on several occasions. Several steps were taken to alleviate this problem, but none were satisfactory to Universal.

On October 30, 2002, Universal provided notice to Federal of its alleged losses stemming from the mold and bacterial contamination of the Evergreen building. Specifically, Universal claimed damages by way of lost leasehold improvements, cleaning and moving expenses, and lost business income under its property insurance policy.[5] Federal denied the claim, resulting in the present lawsuit.[6]

Upon Federal's motion for summary judgment, the district court held that Universal was not entitled to coverage under its property insurance policy as a matter of law. Specifically, the court held that Universal had not suffered any "direct physical loss" as required by the policy. Following entry of final judgment, Universal filed this timely appeal.

II.

We review de novo a district court's grant of summary judgment. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether the movant has met this burden, we view the evidence in the light most

---

[5]Universal also claimed personal property losses. However, as described below, such losses were not the result of mold or bacterial damage.

[6]Universal filed suit in Michigan state court in May 2006. Federal thereafter removed the action to the United States District Court for the Eastern District of Michigan based upon diversity jurisdiction.

favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

As we are operating under diversity jurisdiction, we must apply Michigan law in resolving the present appeal. In so doing, we apply "the law of the state's highest court." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). "If, however, the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from all relevant data." *Id.* (internal quotation marks and citation omitted). "[A]n intermediate appellate court's judgment that announces a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214, 218-19 (6th Cir. 1990) (internal quotation marks and citation omitted).

In applying Michigan law to insurance-coverage matters, we must give the words of an insurance policy their plain and ordinary meaning. *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 505 (Mich. 1995). If a term is ambiguous, the ambiguity is to be construed against the insurer. *Id.* at 504. Summary judgment is appropriate if the applicable policy terms are unambiguous. *Mahnick v. Bell Co.*, 662 N.W.2d 830, 833 (Mich. Ct. App. 2003).

III.

The insurance policy at issue contains the following coverage provision: "We will pay for *direct physical loss or damage to building or personal property* caused by or resulting from a peril

not otherwise excluded[.]" (Emphasis added.) The word "building" is defined as: "a structure; building components; completed additions; additions to the structure under construction; and alterations and repairs to the structure." The policy further specifies that the word "building" does not mean "land, water or air, either inside or outside of a structure" or "any structure [Universal does] not own, occupy and [is] not legally or contractually require to insure." The phrase "personal property" is defined as:

> all [Universal] business personal property; business personal property in which [Universal has] an insurable interest; patterns, molds and dies; personal property of others; labor, materials and services furnished or arranged by [Universal] on personal property of others; sign fixtures, glass and other tenant's improvements and betterments; and glass in buildings [Universal does] not own if [it is] legally or contractually required to maintain such glass.

The phrase "personal property" is similarly defined to exclude "land, water or air, either inside or outside of a structure."

Left undefined by the insurance policy is the critical phrase "direct physical loss or damage." Federal contends that the mold and bacterial contamination experienced by Universal at the Evergreen building does not constitute "direct physical loss or damage" because no tangible property insured by Universal was structurally damaged.[7] In contrast, Universal contends that it did suffer

---

[7]During oral argument, Universal claimed that it lost tapes and furniture to mold and bacteria damage. The record, however, reveals that the tapes were not damaged, but merely required cleaning. The record further indicates that *no* Universal property was damaged by mold or bacteria. Rather, it appears that some property was abandoned during the course of Universal's move from the Evergreen building, but that this abandonment was unrelated to the mold and bacterial contamination.

"direct physical loss" because the mold, odor, and bacterial contamination rendered the Evergreen building "uninhabitable" or substantially "unusable," forcing the evacuation of the building.

Unfortunately, there is little Michigan authority providing us with insight into the meaning of the phrase "direct physical loss or damage." In *Acorn Investment Co. v. Michigan Basic Property Insurance Ass'n*, the plaintiff sought coverage for vandalism that resulted in extensive flood damage. No. 284234, 2009 WL 2952677, at *1 (Mich. Ct. App. Sept. 15, 2009) (per curiam). In that case, the policy provided coverage for "direct physical loss" caused by vandalism. *Id.* at *2. The Michigan Court of Appeals held that the word "direct" indicates "'immediate' or 'proximate' cause, as distinct from remote or incidental causes." *Id.* at *2 (citation omitted). While the court did not expound upon the meaning of the phrase "physical loss," it relied upon *de Laurentis v. United Services Automobile Ass'n*, 162 S.W.3d 714 (Tex. Ct. App. 2005), in defining the word "direct." *Acorn*, 2009 WL 2952677, at *2. *de Laurentis*, a Texas Court of Appeals case, is helpful because it addressed whether mold may constitute "direct physical loss." 162 S.W.3d at 723. Because this case was cited with approval by the Michigan Court of Appeals, it provides insight into how the Michigan courts would interpret the phrase "direct physical loss" in this case.

In *de Laurentis*, the policyholder submitted a claim for mold damage, which required the remediation of her furniture, art work, clothing, and other personal property. 162 S.W.3d at 716. The insurer denied the policyholder's claim, asserting that mold damage did not constitute "physical loss." *Id.* at 717-18. The Texas Court of Appeals relied upon dictionary definitions in resolving the question of coverage, *id.* at 723, a practice adopted in Michigan, *see Citizens Ins. Co. v. Pro-Seal*

*Serv. Group, Inc.*, 730 N.W.2d 682, 687 (Mich. 2007). The court held that a "physical loss" is "simply one that relates to natural or material things." *de Laurentis*, 162 S.W.3d at 723 (citing Webster's Third New Int'l Dict. 1706 (1993)). Based upon this definition, the Texas Court of Appeals held that "tangible damage" to the policyholder's property, caused by mold, constituted "physical loss." *Id.*

The definition provided in *de Laurentis*, if adopted by the Michigan courts, would require the denial of coverage in this case. Universal did not experience any form of "tangible damage" to its insured property. All remediation efforts were paid for by Universal's landlord, and not a single piece of Universal's physical property was lost or damaged as a result of mold or bacterial contamination. Universal seeks coverage for cleaning and moving expenses, lost (undamaged) improvements attached to the Evergreen building, as well as lost business income. These are not tangible, physical losses, but economic losses. *Accord Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, No. Civ. 98-434-HU, 1999 WL 619100, at *7 (D. Or. Aug. 4, 1999) (holding that a policyholder could not recover under a policy requiring "physical loss" unless the claimed mold physically and demonstrably damaged property); *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d 27, 37-38 (Cal. Ct. App. 2010) ("A direct physical loss contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.") (internal quotation marks and citation omitted); *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1144 (Ohio Ct. App. 2008) (holding that mold does

not constitute "physical damage" because "[t]he presence of mold did not alter or otherwise affect the structural integrity of the [property]"); 10 Couch on Ins. § 148:46 (3d ed. West 1998) ("The requirement that the loss be 'physical,' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.").[8]

Furthermore, even if Michigan were to adopt a more expansive definition of the phrase "direct physical loss or damage," Universal would still not be entitled to coverage.[9]  Several courts have held that "physical loss" occurs when real property becomes "uninhabitable" or substantially "unusable." *See e.g.*, *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) ("When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct [physical] loss to its owner."); *Prudential Prop. & Cas. Co. v. Lillard-Roberts*, CV-01-1362-ST, 2002 WL 31495830, at *9 (D. Or. June 18, 2002) (holding that there may be a "direct physical loss" when property is "rendered uninhabitable by mold"); *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 16-17 (W. Va. 1998) (holding policyholders to suffer a "direct physical loss" when their homes

---

[8]Universal did clean several pieces of personal property in order to remove any possible mold or bacteria contaminant.  Such cleaning was performed with hot water and "Lysol type, cleaning, household cleaning things."  We do not believe that the Michigan courts would find basic cleaning to constitute physical loss or damage. *See Columbiaknit*, 1999 WL 619100, at *6 (holding that clothing is not "physically damaged" if a "mere washing" would alleviate the alleged damage).

[9]Accordingly, we need not decide what definition Michigan would ultimately adopt.

were rendered uninhabitable due to threat of rockfall); *W. Fire Ins. Co. v. First Presbyterian Church*,

437 P.2d 52, 55 (Colo. 1968) (holding that the policyholder suffered "direct physical loss" when "the

accumulation of gasoline around and under the [building caused] the premises to become so

infiltrated and saturated as to be uninhabitable, making further use of the building highly

dangerous").

Based upon our detailed review of the record, we agree with the district court that Universal

has failed to present a genuine issue of material fact regarding the uninhabitability or usability of the

Evergreen building. First and foremost, no expert recommended that Universal evacuate the

building. While Carmichael discussed some concerns regarding air quality, as a mechanical

engineer, he conceded that he does not have the expertise to testify regarding such matters.

Accordingly, there is no evidence in the record indicating that Universal was unable to remain in the

Evergreen building during remediation. Moreover, Universal cannot recover for alleged

uninhabitability relating to air-quality issues. Indeed, the insurance policy excludes "air" from the

definition of both "building" and "personal property."[10]

Certainly, there is evidence in the record indicating that working in the Evergreen building

during remediation was difficult. Through no fault of its own, Universal was forced to work in a hot

---

[10]There is evidence in the record that a few Universal employees were sick around the time of the mold and bacterial contamination. However, none of these ailments were linked to the conditions of the leased premises. Moreover, most of the testimony regarding such illnesses constitutes inadmissible hearsay.

and crowded space. However, Universal has not put forth any evidence indicating that such temporary conditions rendered the building "uninhabitable" or substantially "unusable."

In addition to the uninhabitable or unusable standard, a handful of courts have held that persistent and pervasive odor may constitute "physical loss." *See e.g.*, *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (holding that odor caused by defective carpeting may constitute "physical injury" to property); *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, No. 9400837, 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996) ("[F]umes are a physical loss which attaches to the property."); *Farmers Ins. Co. of Or. v. Trutanich*, 858 P.2d 1332, 1335 (Or. Ct. App. 1993) (holding that the persistence of an odor throughout a home physically damaged the property).[11] However, while Universal employees detected a strong odor on the first floor of the Evergreen building in August 2002, there is no evidence that the odor affected the second and third floors or permeated any property insured by Universal. In addition, there is no evidence that the odor persisted. Indeed, all the evidence indicates that the odor was immediately addressed and reduced. By December 2002, no odors were reported. More importantly, no insured property was damaged or replaced as a result of odor.[12]

---

[11]None of these cases, however, involved policies that expressly excluded "air" from their coverage.

[12]Because we agree that Universal has not suffered a "direct physical loss," we need not address Federal's alternative arguments in favor of summary judgment.

IV.

In sum, while Universal certainly suffered a large inconvenience as a result of the mold and bacterial contamination of the Evergreen building, the damages resulting therefrom are not covered by the insurance policy issued by Federal. Universal did not suffer any tangible damage to physical property, nor were the Evergreen premises rendered uninhabitable or substantially unusable. Accordingly, we affirm the judgment of the district court.