NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0516n.06

Case Nos. 24-5152/5179

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BUILDERS MUTUAL INSURANCE COMPANY, | ) | **FILED** |
| | ) | Dec 11, 2024 |
| | ) | KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| GCC CONSTRUCTION, LLC (24-5179); | ) | |
| TAHINI MAIN STREET, LLC (24-5152), | ) | OPINION |
| | ) | |
| Defendants-Appellants. | ) | |

Before: MOORE, CLAY, and THAPAR, Circuit Judges.

THAPAR, J., delivered the opinion of the court in which CLAY, J., concurred, and MOORE, J., concurred in the judgment. MOORE, J. (pp. 23–24), delivered a separate concurring opinion.

THAPAR, Circuit Judge. How many fallen bricks does a collapse make? Parties can contract to answer that question however they want. Here, Tahini Main Street and GCC Construction said that a collapse occurs when a building abruptly falls. So when bricks tumbled off an old building in Tennessee, there was a partial collapse. But a partial collapse doesn't mean the whole building abruptly fell. Thus, we affirm the district court's judgment that Tahini and GCC aren't entitled to recover under their insurance policy.

I.

Bricks are the building blocks of civilization, dating back to at least 7,500 BC when early Syrians labored to erect Tell Aswad close to present-day Damascus. Since then, bricks' sturdiness have provided a firm foundation for buildings near and far. For that reason, they're also baked into popular culture, standing for prudence and permanence in stories ranging from the Three Little Pigs to the Tower of Babel. Indeed, bricks even provided the famed foundation of the walls of Jericho.

But individual bricks are only as good as the mortar that binds them into walls. When that mortar fails, bricks can come tumbling down. In some cases, as with Jericho's fabled walls, all the bricks might give way. In others, only a few bricks might come loose or slide off. And, in still more scenarios, perhaps many bricks might fall while hundreds remain.

This case deals with the aftermath of just such a tumbling. Tahini Main Street ("Tahini") bought a century-old brick building in Chattanooga, Tennessee. Tahini's structure was built using what masons call three-wythe construction. That phrase means that the building's walls consisted of three brick layers—each layer is a "wythe"—that sit next to each other. When Tahini renovated the building so it could lease it out, it hired GCC Construction, LLC ("GCC") to make a few changes. Relevant here, GCC planned to add windows. To do that, they cut a new opening into the building's western wall, boring straight through all three brick layers. When they finished slicing through the wall, some bricks rained down from the opening's top. The middle row emptied itself into the new gap, leaving the two outside rows with nothing in between. In short, the wall lost its middle.

The builders realized this was a problem. So they asked an engineer named David Cartwright to assess the damage. He thought the wall was "falling out" and "crumbly." R. 89-4,

Pg. ID 611.  He concluded that "due to the severe unforeseen deterioration only recently uncovered inside the existing west brick wall," the wall couldn't carry the renovated building's load anymore. *Id.* at Pg. ID 619.  So he suggested that Tahini build a new structural wall and demolish the old brickwork.

Tahini and GCC asked their insurer, Builders Mutual Insurance Company ("Builders Mutual"), to pay for this new wall and any damage that resulted from the falling bricks.  Because the construction crew had an insurance policy that said Builders Mutual would cover a state of failure or collapse, Tahini and GCC thought the window incident entitled them to compensation. After all, if a bunch of bricks abruptly fell, wasn't that a collapse?

Builders Mutual investigated.  They first assigned an independent adjuster, Greg Bankston, to inspect the site.  When he arrived, GCC's project manager told him the wall hadn't collapsed. Bankston looked around, saw the still-standing wall, and told Builders Mutual that the wall looked substantively intact.

So Builders Mutual denied coverage.

Tahini and GCC didn't accept that result.  Tahini sent Builders Mutual a demand letter claiming $614,225 in "direct physical loss" and $465,000 in lost rental profit.  The letter also said that the insurer's failure to pay constituted bad faith.

When Builders Mutual received Tahini's new request, it asked Tahini to provide some additional information.  After getting new details, the insurer requested a coverage opinion and noted it was "seriously reviewing" Tahini's information and requested an extension to respond to the demand.  R. 89-18, Pg. ID 781.  Tahini accepted this request.

Builders Mutual then filed a declaratory judgment action asking the district court to say it didn't have to cover the damages that Tahini and GCC claimed.

In response, Tahini and GCC counterclaimed. They asked for a declaratory judgment that Builders Mutual had a duty to indemnify them; damages for breach of contract, loss, and property damage; and a statutory bad-faith penalty. They also asked the court to dismiss Builders Mutual's complaint.

Before trial, the district court granted partial summary judgment, reasoning that the fallen bricks were a "collapse" and declaring that hidden decay caused the collapse. But at trial, the court found that the "relatively minor collapse" from above the window had no significant effect on the remaining wall or building. R. 181, Pg. ID 4962. Indeed, the court explained that the "collapse merely revealed the building's long-existing lack of structural integrity." *Id.* Thus, neither GCC nor Tahini could recover under the policy or on their breach of contract and bad-faith counterclaims.

Tahini and GCC appealed.

## II.

### A.

Tennessee law governs this dispute, as Tennessee is the only state with a significant relationship to the transaction. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992).

### 1.

Tennessee law tells us to apply ordinary contract interpretation principles to disputes about insurance coverage. *Garrison v. Bickford*, 377 S.W.3d 659, 663–64 (Tenn. 2012). So we look to a contract's "plain and ordinary meaning." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012) (citation omitted). That's the meaning an average policy holder and insurer would attach to a policy's language. *Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 216 (Tenn. Ct. App. 2013). In doing so, a court construes a policy "as a whole in a reasonable and

logical manner." *Standard Fire Ins. Co. v. Chester-O'Donley & Assocs.*, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998).

But what if there's no clear ordinary meaning? If the policy is ambiguous, meaning it's susceptible to more than one plausible reading, Tennessee "strictly construe[s]" policies for the insured. *Garrison*, 37 S.W.3d at 664. But courts can't place a "strained construction" on the language just to find ambiguity where none exists. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

In Tennessee, appellate courts don't defer to trial courts' contract interpretations. *Garrison*, 37 S.W.3d at 663. Because disputes about insurance coverage are contract interpretation questions, the trial court isn't entitled to a "presumption of correctness." *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009).

2.

So what did the insurance policy cover? The policy states that Builders Mutual "will pay for direct physical 'loss' to Covered Property from any Covered Cause of Loss described in the Coverage Form." R. 142-2, Pg. ID 2425. So, the question is: Whether (i) there was a "direct physical loss" (ii) to covered property (iii) from a covered cause of loss described in the coverage form.

i.

There's no doubt that a "direct physical loss" occurred when the middle wythe came down.

Start with the ordinary meaning of "direct physical loss." "Direct" means "stemming immediately from a source." Merriam-Webster, "Direct," https://www.merriam-webster .com/dictionary/direct. "Physical" means "having material existence" or "relating to material things." Merriam-Webster, "Physical," https://www.merriam-webster.com/dictionary/physical.

And "loss" means "the act or fact of being unable to keep or maintain something or someone," or the "partial or complete deterioration or absence of a physical capability or function." Merriam-Webster, "Loss," https://www.merriam-webster.com/dictionary/loss. All told, a "direct physical loss" is a deterioration of a physical item that stems from some source.

Several Tennessee courts have interpreted similar language and arrived at conclusions consistent with our reading of the policy's text. In *Great River Insurance Co. v. Edison Automation, Inc.*, for example, the Tennessee Court of Appeals considered a policy that covered "direct physical loss of or damage." No. M2001-01635-COA-R3-CV, 2004 WL 892528, at *2 (Tenn. Ct. App. Apr. 23, 2004). The appellant argued that it suffered such a loss after a salesman fraudulently induced it to build a custom machine. *See generally id.* The appellant said the parts were effectively destroyed because the product and its components had no value. *Id.* at *2. There, the court explained that a company's unused disassembled parts weren't covered because the parts weren't destroyed or damaged. *Id.* at *3. The court noted that the parts were fine—there was no deterioration or damage to a physical item. *Id.* Likewise, in *Phillips v. United Services Automobile Association*, the court explained that a policy covering "direct physical loss" included the water damage at issue, despite the policy's exclusions of certain kinds of water damage. 146 S.W.3d 629, 633–34 (Tenn. Ct. App. 2004). Why? Because the water damaged the plaintiff's house. *Id.*

In sum, the plain text and Tennessee courts' interpretations of similar language indicate that "direct physical loss" entails deterioration of a physical item that stems from a source.

Here, physical deterioration occurred when GCC's workers cut a hole in the building's west wall. Several bricks fell from inside the wall to the ground. That's textbook direct physical loss.

While this definition doesn't hurt Tahini and GCC at first glance, they respond that the district court should have defined "direct physical loss," as including preexisting decay that gave rise to the loss. Both companies object to the district court's reliance on a case about how to interpret Michigan law. *See Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012). In *Universal Image*, this court cited in passing a definition of "direct physical loss" that it drew from California law. *Id.*; *see MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d 27, 37 (Cal. Ct. App. 2010). To the appellants, this caselaw doesn't apply to a case about Tennessee law and is out-of-step with other cases cited in *Universal Image*.

While the appellants are right that *MRI Healthcare* doesn't define Tennessee law, they overlook two key points. First, *Universal Image* supports our plain-text reading. There, this court concluded—after surveying authorities that included the *MRI Healthcare* case the parties debate here—that what mattered was "tangible damage" to insured property.[1] 475 F. App'x at 574–75. That's the same as physical deterioration that stems from a source. Moreover, the lower court's citation to California caselaw is ultimately irrelevant when a plain reading of "direct physical loss" yields an unambiguous meaning. *Sputniks,* 368 S.W.3d at 441.

On balance, the term "direct physical loss" has a plain meaning: deterioration of a physical item that stems from a source. Here, when bricks came tumbling down, a physical item—the wall—deteriorated. That's a loss.

---

[1] In the alternative, the *Universal Image* court also noted that the premises at issue were not "rendered uninhabitable or substantially unusable." 475 F. App'x at 575 (citation omitted).

ii.

And that "loss" occurred to "covered property." The policies explain that "the existing building or structure" is "covered property." R. 142-2, Pg. ID 2439. Thus, the falling bricks occurred on covered property.

iii.

The next question is whether a "covered cause of loss" happened. Here, it did—but only for the bricks that actually fell, not the entire wall.

To see why, return to the policy's language. It covers "direct physical loss or damage . . . caused by collapse of all or part of a building or structure" that was caused by "[d]ecay that is hidden from view." *Id.* at Pg. ID 2426. To recover under this insurance policy, Tahini and GCC thus need to make two showings. First, they must show that a collapse—as defined by the policy— occurred. Second, they must show that the collapse "caused" the direct physical loss.

*Collapse*. Here, a collapse occurred. To see why, return to the policy's text.

The policy lays out a complex definition of collapse. It has both positive and negative assertions. On the positive front, it says: "Collapse means an abrupt falling down or caving in of a covered building or structure in whole or in part." *Id.* Next, on the negative side, it describes what isn't a "collapse." First, a "covered building or structure or any part thereof that is in danger of falling down or caving in is not considered to be in a state of collapse." *Id.* Second, a "part of a covered building or structure that is not standing is not considered to be in a state of collapse even if it has separated from another part of the building or structure." *Id.* Third, a "covered building or structure that is standing or any part of a covered building or structure that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." *Id.*

This language isn't ambiguous. One provision, the positive assertion, suggests that something that falls is a collapse. That's straightforward—no one would look at a wall that's standing upright and say it's collapsed. Another term explains that fallen items, like piles on the ground, haven't "collapsed" during the policy's term. That also makes sense—after all, no insurer would write a policy covering a "collapse," only to have the insured party point to a previously demolished building and ask for money. And a third term in the policy outlines that a building that's close to falling hasn't collapsed, either. In other words, items that fall have collapsed, but those presently lying on the ground don't qualify as collapsed, nor do those that look like they're about to collapse. Looking at each provision individually, the "collapse" provision thus yields a neat conclusion: Bricks collapse when they fall.

The district court erred when it found this definition ambiguous. The court thought that the positive definition ("abrupt falling down") couldn't fit with the negative exclusion ("a part of a structure that is not standing is not considered to be in a state of collapse."). R. 156, Pg. ID 3717 (quotation omitted). In other words, because the bricks had fallen and lay on the ground, they were simultaneously covered and not covered. But that's wrong. There's no contradiction between these provisions. When reading the contract "as a whole in a reasonable and logical manner," it's clear that the positive definition applies to items that fall, while the negative exclusions preclude coverage for items that have already collapsed. *Standard Fire Ins. Co.*, 972 S.W.2d at 7.

Now, applying these definitions to this building, some bricks fell when GCC cut a hole in the wall. That's a classic partial collapse as defined by the policy—an "abrupt falling down . . . of a covered building or structure in whole or *in part*." R. 142, Pg. ID 2426. (emphasis added). To be

sure, the whole wall didn't fall—the bricks bordering the middle wythe remained standing. But part of the middle wythe gave way, falling abruptly. That's a collapse.

But remember, the wall remained standing; only some bricks from the middle wythe tumbled through the new window opening. In other words, some bricks fell, yielding a partial collapse under the policy. But that doesn't mean the whole wall collapsed.

In response, Tahini and GCC argue that this court should look beyond the policy's plain language to find that the entire wall collapsed. Their logic goes like this: Because the collapse provision is ambiguous, this court should look to other sources that give rise to the meaning of "collapse." Some sources, notably one case from a Tennessee appellate court, construed "collapse" broadly, to include "substantial impairment of the structural integrity of the building." *See Rankin v. Generali-U.S. Branch*, 986 S.W.2d 237, 238 (Tenn. Ct. App. 1998) (citations omitted). Because the lower court applied a narrower definition of collapse, Tahini and GCC say it erred. And, because the "collapse" around the window revealed substantial impairment to the building's structural integrity, Builders Mutual should be liable for whatever damages result. Here, they say, it's the building's actual cash value.

But Tahini and GCC are incorrect. Here, the document isn't ambiguous so we can't look beyond the terms of the contract. Second, even if courts could look beyond the policy's terms, *Rankin* doesn't help Tahini and GCC. For one, that case deals with a policy that didn't set out a positive definition of "collapse." *See id.* at 237–38. This policy does, so there's no need to lean on general legal principles like the *Rankin* court did. Instead, the parties are bound by the terms they agreed to. And those terms require an "abrupt falling down." The whole wall never abruptly fell. Third, courts applying Tennessee law have found that policies that indeed define "collapse" aren't subject to *Rankin*'s substantial-impairment standard. *See, e.g.*, *Huntingdon Ridge*

*Townhouse Homeowners Ass'n v. QBE Ins. Corp.*, No. 3:09-cv-00071, 2009 WL 4060458 (M.D. Tenn. Nov. 20, 2009). The takeaway: if "abrupt falling down" is written into the contract, then courts apply that language.

In the alternative, Tahini and GCC assert that the decay inside the wall caused a collapse. So, they argue, since decay is covered, the collapse "made that deterioration and/or decay a covered loss." GCC Br. at 23 n.5. True, but irrelevant. Indeed, previous decay had damaged the building. But even if the partial collapse resulted from decay from years ago, that doesn't mean an entire wall collapsed. Decay doesn't get rid of the collapse requirement.

Our caselaw isn't to the contrary. Tahini cites *Tabernacle-The New Testament Church v. State Farm Fire & Casualty Co.*, but that case doesn't knock down our holding. 616 F. App'x 802 (6th Cir. 2015). Why? It never addressed a policy that defined collapse as an "abrupt falling down." *See id.* at 804. Instead, it explained that gradual decay could lead to recovery if defective construction materials and methods had been used. *Id.* at 810–11. So that case isn't relevant here, where the policy required an abrupt falling or caving in.

Thus far, things look pretty good for Tahini and GCC. We've explained that there was a harm to covered property that stemmed from a partial collapse. But Tahini and GCC must still show that the falling bricks "caused" a direct physical loss.

*Causation*. The insurance policy committed to pay for "direct physical loss or damage to Covered Property, caused by collapse." R. 142-2, Pg. ID 2426. So the relevant question is what damage the middle wythe's partial collapse caused. Here, Tahini and GCC say that the collapse caused the building's structural integrity to fail. But that's not right. The district court found the building's structural integrity was impaired long before the collapse occurred. And that factual

finding wasn't clearly erroneous. Thus, the "collapse" caused damage insofar as the middle wythe lost some bricks.

But the falling bricks didn't cause the wall to lose its structural integrity. As the district court's factual findings make clear, the building experienced "very significant deterioration" before Tahini and GCC put the policy in place. R. 181, Pg. ID 4963. As Cartwright—GCC's own engineer—explained in his report, the building had "severe unforeseen deterioration only recently uncovered inside the existing West Brick Wall" that made it "not structurally viable to carry the loads of the new renovation." R. 142-21, Pg. ID 2543. In other words, the window-cutting and resulting brick shower didn't cause structural damage to the property. It only revealed the damage to the underlying structure. In plain English, the building was in bad shape long before the collapse occurred.

The evidence supported the district court's finding that the partial collapse didn't damage the building's structural integrity. Structural engineer Colby Butterfield explained that the center wythes were likely a "core of rubble" throughout the building. R. 142-27, Pg. ID 2578. What's more, photos and videos showed "mortar being easily scraped away with a nail, mortar blowing away in the wind like fine sand, deteriorated bricks being pulled away by hand, and a portion of a wall being knocked down almost effortlessly by a single worker with a piece of wood." R. 181, Pg. ID 4965. In other words, the falling bricks were a symptom, not a cause, of the building's challenges.

Cartwright's and Butterfield's statements emphasize this point. Cartwright consistently maintained that preexisting decay caused the wall's structural problems. R.184, Pg. ID 5114-15; R. 145-5, Pg. ID 3217. Likewise, while Butterfield did note that the collapse introduced "uncertainty" into the company's renovations, he also said that the building's decay was

"ubiquitous" because there was a "core of rubble" throughout the wall. R. 142-27, Pg. ID 2578. In other words, preexisting damage led the building to lose its structural integrity.

To be sure, Tahini and GCC argue that Butterfield's testimony cuts against the other evidence here. But that asks us to pick a winner from a debate among engineers. This court can't do that. Instead, appellate courts defer to the district court's factual findings, which weren't clearly erroneous.

At best, the falling bricks "caused" a different damage—the structurally impaired wall now lacked part of its middle wythe. To be sure, a "collapse" caused that. But damages for the middle wythe's collapse is a far cry from what Tahini and GCC seek: a judgment that the entire wall collapsed plus damages for the resulting lack of structural integrity.

3.

Thus far, we've held that the falling bricks were a collapse and that they caused a direct physical loss or damage to covered property: the middle wythe. But what damages are due? Again, the policy has answers. It explained that Builders Mutual could pay for "loss" in several ways. R. 142-2, Pg. ID 2439. The insurer would pay the least of (a) the insurance limit; (b) the amount spent to repair damaged or destroyed property; (c) the existing building's cash value at the time of the loss; and (d) the amount paid for the buildings or structures plus the value of improvements.

The relevant question, then, becomes the measure of damages for the partial collapse of a wall that already lacked structural integrity. But here, Tahini and GCC did not provide any evidence of this cost beyond simply arguing the wall couldn't be repaired.

i.

Below, the trial court concluded that Tahini is entitled to the "cost of repairing the fallen bricks under the policy." R. 181, Pg. ID 4972. That makes sense. After all, that's the precise damage the insurance policy covered. And because the district court found that the bricks in question could be placed back in the wall, there's enough evidence to conclude that the wall could be repaired. But the firms didn't ever present evidence of what that would cost. So they ultimately couldn't recover.

Tahini and GCC make several unconvincing arguments in response. First, they argue that they can't repair the wall because it would be impossible or impracticable to put new bricks in the wall. But the district court's factual findings reveal otherwise. The district court "credit[ed]" Builders Mutual's expert John Speweik, who testified that the bricks at issue could've been repaired. *Id.* at Pg. ID 4969. And, contrary to appellants' arguments, that's a classic factual determination entitled to deference.

While Tahini and GCC argue that Speweik's testimony had several issues, their assertions don't lead us to find the district court's conclusion to be clearly erroneous. For example, Tahini asserts that Speweik didn't testify that the bricks in the middle wythe could be replaced, but only the bricks on the outer two wythes could be replaced. But that's misreading Speweik's testimony. Speweik said the brick "throughout this wall" could be "repaired pretty efficiently." R. 186, Pg. ID 5639. Indeed, Speweik explained that the wall at issue—all three wythes—was previously an interior wall. Thus, when talking about how the whole wall was now facing the elements and could be "repaired pretty efficiently," that could well have included all three wythes. At the very least, it wasn't clearly erroneous for the district court to reach this conclusion. And while Tahini is correct that other witnesses disputed that the middle-wythe bricks could be replaced,

disagreement alone doesn't demonstrate clear error. Here, an expert testified the bricks could be replaced—that supports the district court's reasoning.

Second, GCC argues that Speweik wasn't qualified to make this claim. That argument echoes their *Daubert* challenge, which is explored below. But whichever way they raise it, it's unconvincing. For one, Speweik is an expert in historic masonry. And before the trial, he reviewed photographs, engineers' reports, and videos; developed a significant understanding of the building; and visited the site. While he wasn't an engineer and couldn't opine on the wall's structural integrity, he could opine on what it would take to put historic masonry back into a dilapidated wall.

Tahini's and GCC's additional counterarguments also fail. Start with Tahini. Tahini now argues they should get the building's cash value and lost profits. All these claims have a central problem, though: they were couched as if the entire wall collapsed. But it didn't. Because the "collapse" didn't impair the entire wall, Tahini and GCC can't recover for that damage. Instead, they can only recover for the "damage" that the falling bricks caused to an already structurally deficient building.

Similarly, Tahini and GCC can't recover the cost of rebuilding the entire structure or the cash value of the building under the theory they raised at trial. Replacing the entire building would only make sense if the collapse rendered the whole wall structurally unsound. But that didn't happen—the collapse consisted of several bricks falling off a portion of the building. Awarding Tahini and GCC the cost of rebuilding the entire building or awarding them the cash value would give Tahini and GCC a windfall.

GCC and Tahini's public policy arguments are also unconvincing. GCC argues that this court should look to "public policy considerations" to determine whether Builders Mutual ought

to pay the building's actual cash value. In so doing, GCC wants courts to define "collapse" broadly to cover incidents like this one. GCC cites several cases from jurisdictions with no connection to this case. GCC argues that building decay is a gradual process and Builders Mutual knew that Tahini and GCC were renovating the building. All told, GCC's argument is another way of asking us to interpret the contract to mandate that Builders Mutual pay the building's actual cash value. But we must adhere to the policy's plain text. *Sputniks*, 368 S.W.3d at 441. Public policy considerations aren't within the contract's four corners.[2]

ii.

Next, Tahini argues for a different kind of damages. This time, it seeks to be paid for an alleged breach of contract, which it says includes lost profits.

But Tahini is wrong. In Tennessee, a breach of contract claim must have damages caused by the breach. *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (quotation omitted). While the insurance policy was an enforceable contract, the breach didn't cause any damages. As explained, the preexisting decay caused the building to become structurally unsound and thus unrentable. The direct physical loss here—the fallen bricks from the middle wythe—thus did not cause the lost profits. Thus, Tahini's breach of contract action also fails.

---

[2] Even if we can consider public policy when interpreting the language of contractual provisions, the cases Tahini and GCC cite are inapposite. Why? They discuss whether a contract is void as a matter of public policy. *See, e.g.*, *Beasley v. Tex. & Pac. Ry. Co.*, 191 U.S. 492 (1903); *Baugh v. Novak*, 340 S.W.3d 372, 381 (Tenn. 2011). Whether a contract is void from the beginning is distinct from interpreting a contract through the lens of desired policy goals, which is what Tahini and GCC want us to do.

B.

Next, Tahini objects to the trial court's decision to allow testimony from two experts: Matthew G. Richardson and John Speweik.[3] The appellants argue that the district court abused its discretion when it denied the *Daubert* motions that GCC and Tahini filed. But the court was correct to deny those motions.

1.

For an expert's opinion to be admissible in federal court, the expert must be qualified and his opinion must be reliable and relevant. *See* Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). So a witness may testify as an expert if he proves that it's more likely than not that (a) his scientific, technical, or otherwise specialized knowledge will help the fact finder understand the evidence or determine a fact; (b) his testimony is based on sufficient facts or data; (c) his testimony stems from reliable principles and methods; and (d) his opinion applies reliable principles and methods to a case's facts. Fed. R. Evid. 702. If a party opposes another party's expert testimony, a court may admit that testimony only when the party proffering the expert shows, by a preponderance of the evidence, that the expert meets these requirements. *Id.*

We review a district court's decision to admit or exclude expert testimony for abuse of discretion. *See U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 748 (6th Cir. 2016).

---

[3] GCC also argues that Richardson and Speweik weren't qualified to offer testimony. But GCC mentions these alleged shortfalls when discussing whether they could replace the bricks—not in an analogous *Daubert* claim. So, it's unclear from their briefing whether they intended to raise the same *Daubert* claims as those that Tahini brings in this appeal.

2.

Start with Richardson. He was sufficiently qualified and reliable that the district court didn't abuse its discretion when admitting his testimony. Richardson has strong qualifications: He worked as a civil engineer and transitioned into forensics, meaning he studies what went wrong with buildings. He's done that for the past eighteen years. And his testimony was reliable. Before trial, he reviewed photographs, videos, and Google Earth images showing Tahini's building. True, Richardson never examined the building or its structure in person. But he did examine the engineering reports Cartwright submitted about the building. After a lengthy discussion about the precise way the wall was built, Richardson concluded the wall's integrity wasn't affected when GCC and Tahini cut holes where they hoped to put windows. Those are enough facts and data to survive our review.

Tahini's objection to Richardson's statements boils down to unconvincing assertions. They say he couldn't opine on the wall's condition because he only looked at photos and videos depicting the site. In other words, they don't like that Richardson was a forensic engineer—someone who looks backwards and evaluates what he saw based on documentary evidence. That's fair enough. Tahini and GCC were welcome to poke holes in Richardson's methods and conclusions at trial. And they did so. But having questions about an expert's methods and conclusions doesn't mean he's not reliable enough to hear from in the first place.

The appellants' arguments about Speweik fare no better. Speweik is a historic masonry specialist. He'd written a book on the topic, published a magazine on such construction, and is involved in several professional associations involving masonry. Before trial, he reviewed photographs, engineers' reports, and videos. He also visited the site. Speweik testified that the wall was previously an interior wall that wasn't designed to face the outdoors. He also said he

didn't think the fallen bricks in the middle wythe impaired the entire wall's "structural stability or integrity." R. 186, Pg. ID 5653. On cross-examination, Speweik explained that he used the phrase "structural integrity" not to refer to the weight a wall could hold, but to refer to masonry falling and hitting someone. *Id*. at 5657–58. Thus, Speweik testified about the masonry on that wall. And that pairs well with his expertise in historic masonry.

In response, Tahini argues that Speweik really talked about whether the wall was structurally sound, which Tahini says is a determination that only an engineer could make. And, because Speweik didn't finish college, he isn't an engineer and thus couldn't talk about a wall's ability to bear loads.

Tahini is right that Speweik, a non-engineer, wasn't qualified to opine on whether the fallen bricks impaired the wall's "structural stability or integrity." *Id.* at Pg. ID 5653. But Speweik noted that he was only commenting on future bricks falling from the wall—not whether the building itself (or the wall) could bear loads. To be sure, this phrasing isn't precise. But GCC and Tahini didn't think his testimony was so outside his expertise as to merit an objection at the time. *Id.* This failure suggests that, in context, it was clear that Speweik was referring to masonry and not the building's structural integrity. Indeed, Speweik explained in detail that he wasn't an engineer and couldn't determine a wall's ability to bear loads. *Id.* at Pg. ID 5654–56. This disclaimer—combined with Speweik's focus on masonry—means that the district court didn't abuse its discretion in admitting his testimony under *Daubert*.

In sum, the district court didn't abuse its discretion when it allowed testimony from Richardson and Speweik.

C.

Finally, Tahini and GCC argue that, considering all the above, Builders Mutual's denial was a bad-faith refusal to pay under Tenn. Code Ann. § 56-7-105(a). That statute explains that if a plaintiff can show that an insurer's refusal to pay for a loss was "not in good faith," then they can recover extra damages. *Id.* But Tahini and GCC can't make that showing.

1.

Tennessee courts have explained that the bad-faith inquiry has four steps: (1) the insurance policy must have become due and payable, (2) the insured must have made a formal demand for payment, (3) the insured must have waited 60 days after making his demand before suing (unless there was a refusal to pay before the 60-day period ends), and (4) the insurer's refusal to pay must not have been in good faith. *See Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986); *De Rosset Hat Co. v. London Lancashire Fire Ins. Co.*, 183 S.W. 720 (Tenn. 1916).

Here, no one disputes that two elements are satisfied. Tahini and GCC submitted a formal demand for payment. And both companies filed their counterclaims well outside the 60-day waiting period.

Thus, the bad-faith claim turns on whether (1) Tahini and GCC are entitled to recover under the policies and (2) whether Builders Mutual's denial was in bad faith. Here, Tahini and GCC have shown they're entitled to recover for the partial collapse that occurred when bricks tumbled from the wall at issue. But they aren't entitled to recover for the alleged structural damage to the entire wall or the whole building.

And Tahini and GCC can't show the trial court clearly erred when it found that Builders Mutual didn't act in bad faith.

The "not in good faith" standard is demanding. The insurer must show a "disregard or demonstrable indifference toward the interests of its insured." *Johnson v. Tenn. Farmers Mut. Ins.*, 205 S.W.3d 365, 370 (Tenn. 2006). That standard means an insurer must exercise ordinary care and diligence in investigating the claim and possible damages. *Id.* And, an insurance company's decision to file a declaratory judgment action "creates a rebuttable presumption the insurance company is acting in good faith." Tenn. Code Ann. § 56-7-102(f). All told, a claimant arguing that his insurer acted in bad faith faces many obstacles.

In Tennessee, whether an insurance company acted in bad faith is a factual determination. *Johnson*, 205 S.W.3d at 370–71. Thus, this court can't set aside a trial court's determination unless it was clearly erroneous. *See* Fed. R. Civ. P. 52(a)(6).

Start at the beginning. Because Builders Mutual sought a declaratory judgment that their policy didn't cover the "collapse," they're entitled to a presumption that they acted in good faith. Tenn. Code Ann. § 56-7-102(f).

And there's evidence that the insurer didn't act in bad faith. Builders Mutual investigated the claim with ordinary care and diligence. When it received Tahini and GCC's report, the insurer hired an adjustor to examine the property. GCC's project manager told that adjustor that the wall hadn't collapsed. When Tahini and GCC sent an expert report to Builders Mutual, that report didn't mention collapse. And the expert who prepared that report said that he didn't consider the falling bricks to be a structural collapse under the policy. What's more, Builders Mutual relied on a GCC and Tahini engineering report when it concluded that no collapse occurred. All told, that's sufficient evidence that the insurer didn't act in bad faith, and enough to say that the district court didn't clearly err in reaching this conclusion. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

Tahini's and GCC's arguments to the contrary fail. At bottom, they assert that Builders Mutual didn't do a prompt and thorough investigation, or otherwise delayed so that the firm didn't have to pay. These claims hinge on Dr. William Warfel's testimony. Dr. Warfel testified that he thought Builders Mutual fell short because they failed to ask for statements from the insured parties, document what subcontractors GCC used, get a coverage opinion, keep documentation from the adjustor, and hire a follow-up engineer.

But the district court didn't clearly err when it said that the insurer's actions didn't amount to bad faith. For one, the appellants' arguments collapse into a claim that the district court didn't correctly weigh the evidence before it. While appellants may disagree with the district court's conclusion, there's ample evidence suggesting Builders Mutual didn't act with "disregard or demonstrable indifference toward the interests of its insured." *Johnson*, 205 S.W.3d at 370. They hired an adjuster, relied on Tahini and GCC's own engineering reports, and filed a declaratory judgment. *See* Tenn. Code Ann. § 56-7-102(f). Although Tahini objects that Builders Mutual didn't hire their own engineering expert or bring in a witness to challenge Dr. Warfel's testimony, Dr. Warfel explained that the insurer couldn't be faulted for relying on GCC and Tahini's own reports or what they said. Thus, Tahini and GCC's bad-faith arguments fail.

\* \* \*

We affirm.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I concur in the judgment in this case. The trial evidence demonstrated that only a portion of one wall collapsed. Thus, under the plain terms of the contract, Tahini and GCC are entitled to coverage for only that partial collapse. Neither put forward damages evidence in support of their claim for partial collapse. No more is needed to decide this appeal.

This case comes to us in diversity and involves only questions of contract interpretation. *See Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012) ("The question of the extent of insurance coverage is a question of law involving the interpretation of contractual language . . . ."). Because the insurance policy was executed in Tennessee and covers Tennessee property, and because there is no suggestion that another state's law should apply, I apply Tennessee contract law. *Williams v. Smith*, 465 S.W.3d 150, 153 (Tenn. Ct. App. 2014).

"Tennessee's jurisprudence on contract interpretation cannot be neatly categorized as wholly textualist or wholly contextualist." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 687 (Tenn. 2019). "The common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." *Id.* at 688. "In effectuating this principle, [Tennessee] courts have noted that judges 'are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described.'" *Id.* at 694 (quoting *Staub v. Hampton*, 101 S.W. 776, 785 (Tenn. 1907)). "However, the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation." *Id.* at 694. At bottom, "[c]ommon sense must be applied to each case,

rather than any technical rules of construction." *Id.* at 688 (quoting *Barnes v. Black Diamond Coal Co.*, 47 S.W. 498, 499 (Tenn. 1898)).

Common sense guides my interpretation of the insurance policy. The policy covers "direct physical loss or damage to Covered Property, caused by collapse of all or part of a building or structure caused by . . . [d]ecay that is hidden from view . . . ." R. 142-2 (Insurance Policy at 2) (Page ID #2426). "Collapse means an abrupt falling down or caving in of a covered building or structure in whole or in part." *Id.* This language applies straightforwardly to the trial evidence. There is no dispute that the building at 27 West Main Street is a covered property. The relevant question is the extent to which the building collapsed. Following a bench trial, the district court found "that a total of a few dozen bricks fell" caused by "ubiquitous decay," and that "the remainder of the wall did not move as a result of the small number of bricks falling from the window cut . . . ." R. 181 (1/30/24 Order at 4–5) (Page ID #4964–65). As the district court correctly determined, this is a partial collapse under the policy, and Tahini and GCC could recover damages equal to the cost of repairs and clean up. *Id.* at 12, 16 (Page ID #4972, 4976). Neither claimant submitted evidence in support of damages for a partial collapse. *Id.*

For these reasons, I would affirm the district court.